Dissenting Opinions.
Egan, J.
However important the interests to be advanced by the decree in this case, as manifested by legislative action, I am unable to agree with the conclusions arrived at by a majority of the court. In my opinion the fact that the property bank bonds are secured collaterally to their full amount does not make them any less a part of the debt of the State nor their obligation upon the State any less binding. It may be that those securities may prove ample for their redemption, or they may not. In this dajr of wonderful reduction of values, whereby fortunes heretofore deemed large disappear as if by magic, and contrary to all reasonable human-calculation, we are daily taught the instability of all securities. In what situation, let me ask, will the State be placed if to-day we authorize and decree the issuance of two millions of new bonds of the State, and to-morrow, or a few years hence, she is called upon to redeem her solemn unconditional promises to pay the property bank bonds. Wliat barrier and what defense is to be interposed ? Surely not the existence of these new obligations of the State which swell its liabilities beyond the constitutional limit; and if not, then the practical consequences of the violation of its contract and of the constitutional amendment will have to be met by the State amid 'many embarrassments. Should a contest arise between the holders of the consolidated bonds and those of this new issue, notwithstanding- the present decree, what must be its inevitable result? But however much these considerations might induce ns to pause at the possibility of the State and the holders of its obligations being placed in such embarrassing- position, this is not the question now. The sole question is whether the contemplated issue in favor of the relator will be in excess of the limit placed upon the State debt by the constitutional amendment of 1874.
In my opinion the reasoning of the court and its decision in the *989 case of the State ex rel. Salomon & Simpson vs. Graham, Auditor, 23 An. 402, is as applicable to-day as when it was rendered as to what constitutes “the State debt,’’ and is unaffected by the fact that the late amendment has reduced the limit of that debt below that then existing. It was then held that the property bank bonds constituted and must be counted and considered as part of the debt of which they have all the characteristics, form, and obligations. The opinion and decree even of the present bench in the case of Lesassier & Binder vs. the Board of Liquidation is in accordance with the same view. That suit was brought under the provisions of the funding bill upon some of these very property bank bonds, and by our decree we declared them to be debts of the State, possessed of all the qualities and characteristics which entitle them to be funded, and it was not even attempted to be urged as a defense that they were not fundable, for the reasons now urged. In point of fact, we know from current history that the same view is taken by the Funding Board itself since the last quoted decision. If so, then what becomes of the argument derived from the amount of consols provided for by the funding bill and the amount of the State debt as estimated at the time of its adoption ? Whatever the errors in those estimates, the terms of the amendment were made no less absolute, and the interests of those dealing with the State can not be affected by such error in the motive for the self-imposed curb on its power to incur debts. If argument is to be drawn from that source and from the acts and motives of the Legislature and the circumstances which gave birth to and attended the legislation on this subject, why should we shut our eyes to the historic and important fact that in that unhappy period in the history of the State which originated the necessity and led to adoption of the funding scheme many and large issues of bonds were made which were known to be outstanding and included in the estimates of the amount of the State debt which were more than suspected of having been fraudulently or illegally issued, and many of which were contested by the Attorney General and Auditor, and that large classes and amounts of bonds were in the opinion of the Legislature itself, as declared in the supplemental funding bill, proscribed and prohibited from being funded without prior judicial inquiry and sifting of their character and basis. From these facts it is evident that the Legislature expected and had good reason to expect that enough of what was estimated as forming part of the State debt would be rejected on such judicial inquiry to reduce it when funded within the fifteen million limit, or even below it, but which possessing on their face all the characteristics of obligations of the State, and being supported by the form of legislation, are and must continue to be included in all estimates of State liabilities until the contrary is decided.
*990 Again, what was the funding bill but a new contract tendered by the State to its creditors, which they might or might not accept for reasons satisfactory to themselves; as for instance in the case of the holders of the property bank bonds, because they might consider the existing security sufficient for their ultimate redemption to their full amount. That this was a reasonable and probable view of the matter is made the more manifest by the fact that up to this time after the offer and opportunity has remained open for several years, less than twelve millions of the consolidated bonds have been applied for or issued. This then disposes of the argument drawn from the relative inequality of the estimated State debt with the addition of the property bank bonds and the amount of consolidated bonds provided for. But aside from the foregoing considerations, the language of the constitutional amendment placing a limit upon the amount of the State debt is plain and unambiguous, and its letter can not be disregarded under the pretext of pursuing its spirit. C. C. art. 13. The amount of issue was however under legislative control should that provided for be found insufficient.
I can not, therefore, assent to the force of the arguments arrayed in the opinion of the majority of the court drawn from their view of what was the legislative intention in proposing or that of the people in adopting the constitutional amendment. In point of fact, however, it is well known that the relative amount of debt and new issue of bonds provided for was little known or considered by the people at large in adopting the amendment, and that they were readily inclined to place a check in the form of a constitutional amendment upon the spoliations to which • under the forms of law they had been of late so freely subjected. They accepted the amendment according to its plain letter and the evident meaning of its language. Is it then surprising if the large class of foreign and non-resident holders of the State bonds have accepted or -should interpret the funding bill and the constitutional amendment to mean what it says? That “the whole State debt” should not be increased beyond fifteen millions before the time fixed in the amendment ? This view alone seems to me consistent with the preservation of the public faith, upon which the whole credit of the State rests, and which it is all important to keep sacred. I am, however, consoled by the reasoning by which a majority of the court have reached their conclusions, and by the consequence of that reasoning and view of the question, that it manifests careful regard for the public faith and obligations, and only determines that the limit of fifteen millions of State debt, as contemplated by the amendment, has not been reached, and not that it shall be overstepped; and also by the fact that the bonds to be issued to the relator do not and can not participate in the benefits secured to the consolidated bonds issued or to be issued under the funding bill, as they are themselves not fundable.
*991 It has been argued that the State has the power and right to withdraw its offer to fund, which can not be required to remain always open. •Concede that this is so, it is sufficient answer to say that the State has not withdrawn its offer, but on the contrary still continues the functions of the funding board, and makes appropriation for its expenses; and •that so far from the discontinuance of funding, it has gone on since the passage of the act relied on by the relator, and is going on as we write. The fact then still remains that the consolidated bonds are so secured ■and guarded that they should, and no doubt will, with a reviving prosperity, to which it is hoped the project of relator will largely contribute, ■•soon be ranked among the best of public securities. Believing, however, ■as I do and as the court has decided, that the property bank bonds are ■absolute and unconditional, and not, as argued., mere contingent obligations of the State, and the amount of the (it being conceded counting them outstanding) State debt at the time of the passage of the act providing for the issuance of the bonds for the benefit of relator was or would thereby be made in excess of the constitutional limit, I dissent •from the decree in this case.
DeBlano, J. I concur in the dissenting opinion of Mr. Justice Egan.